UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STACY ABERNATHY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:04CV1597 TIA |
| ) | |
| JO ANNE B. BARNHART, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## Procedural History

On April 30, 2002, Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits (SSI), alleging disability beginning February 19, 2002 due to obesity, anxiety, and depression. (Tr. 109-111, 134, 260-262) Both applications were denied. (Tr. 98-101) On August 26, 2003 and November 26, 2003, Plaintiff testified before an Administrative Law Judge (ALJ). (Tr. 26-71) In a decision dated June 23, 2004, the ALJ determined that Plaintiff was not under a disability and was not entitled to a period of disability, Disability Insurance Benefits, or Supplemental Security Income. (Tr. 13-25) On October 8, 2004, the Appeals Council denied Plaintiff's request for review. (Tr. 3-6) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

**Evidence Before the ALJ**

At her first hearing before the ALJ, Plaintiff appeared in person without an attorney. Also present were Jeffrey F. Magrowski, vocational expert (VE), and Sherry Brauch. Plaintiff did not testify at the August 26, 2003 hearing and instead indicated that she wanted to consult an attorney. (Tr. 26-34)

Plaintiff was represented by counsel at her second hearing on November 26, 2003. VE Arthur E. Smith also testified. Plaintiff was born on March 12, 1973 and was 30 years old at the time of the hearing. She lived in a house with her husband and 12-year-old son. She weighed 350 pounds and measured between 5 feet 4 inches and 5 feet 5 inches. Plaintiff testified that she had weighed over 300 pounds for the past year/year-and-a-half and that she was the heaviest she had ever been. When she worked, Plaintiff weighed about 100 pounds less. While doctors encouraged Plaintiff to lose weight and recommended different strategies such as diet, exercise, and medication, nothing was successful. Plaintiff completed the tenth grade and dropped out during the eleventh grade. She received her GED and later completed a nine month program at the Missouri School for doctor's assistants. Plaintiff also attended college but did not obtain any credits. (Tr. 39-43)

Plaintiff testified that she worked as a waitress at Cecil Whitaker's Pizza in 1991, running the cash register and waiting on customers. She later worked for GHP as a medical assistant. Her duties did not include using the keyboard. She testified that she could type 15 words a minute. In February 2002, Plaintiff was terminated from her job. Plaintiff stated that she was fired for different reasons, one being a 14 or 15 week leave of absence to receive psychiatric help for depression and anxiety. Plaintiff saw Sally Gafford and Dr. Rifkin for about a year-and-a-half until she lost her insurance in

2

2002. Plaintiff also testified that her employer fired her for tardiness, absenteeism, and failure to properly perform her job duties. Plaintiff explained that when she returned from her leave of absence, she was forgetful and unfocused. (Tr. 43-47)

Plaintiff tried to get into different clinics after she lost her job. However, her husband's income prevented her from getting assistance. Plaintiff saw private physicians who gave her free samples of medications. The doctors treated her for arthritis, depression, and anxiety. Plaintiff testified that her depression had worsened. She had difficulty concentrating, crying spells, and lack of interest. Plaintiff had not thought of harming herself for a long time, but some days she just did not care. She described her depression as feeling as though she should be able to move on but could not. (Tr. 47-51, 59)

With regard to her arthritis, Plaintiff testified that she experienced pain in her left heel, left knee, and neck. The pain in her left foot and heel was due to plantar fasciitis. The knee problem was arthritis, but Plaintiff could not remember if it was degenerative. Plaintiff took Ibuprofen, Naprosyn, and Celebrex. She also had reflux for which she took Prevacid. (Tr. 51-52)

Plaintiff testified that her medical condition affected her ability to stand for prolonged periods. For instance, sometimes her heel was so painful that she felt she needed a walker to get out of bed in the morning. She opined that she could only walk about 15 to 20 feet before stopping due to pain. She could only stand for 30 minutes to an hour before she needed to get off her feet. Plaintiff could sit, but she had to constantly move and adjust due to arthritis in her neck. When Plaintiff sat, she put a pillow under her knee to keep her heel off the floor. (Tr. 53-54)

Plaintiff testified that she was unable to do housework the way she used to. It took her three or four times longer to do the dishes, vacuum, or do laundry. Plaintiff did not drive as much as she

used to. She would not leave the house for three or four days because her son took the bus to school and she did not have a reason to go anywhere. When she did drive, she became aggravated with other drivers and experienced road rage. Plaintiff only occasionally worked outside in nice weather, holding a leaf bag open or sweeping the front porch. She grocery shopped once a week either alone or with her son. Plaintiff described a typical day as getting up at 6:00 a.m. and taking a two to three hour nap in the afternoon. In the morning, Plaintiff tried to do household chores. She took a shower or watched TV in the afternoon. Plaintiff prepared dinner about three nights a week and then did dishes, watched TV, and helped her son with homework. (Tr. 54-57)

Plaintiff further testified that she could lift 15 pounds using both hands. She could carry 10 to 12 pounds from one end of a room to the other end. Plaintiff was able to go up and down stairs, but she had to hold on to the rail and put both feet on each step because of heel and knee pain. Some days she could not use the stairs at all. Plaintiff testified that she could sometimes bend, stoop, or squat down and pick up something from the floor. However, it was a real struggle. Plaintiff stated that she attended church twice a year on holidays. She did not belong to any clubs or organizations. Her hobbies included watching TV and reading. Plaintiff read self-help books, the newspaper, and magazines. While Plaintiff helped her son with his homework, she did not participate in many of his school activities. She did attend parent-teacher meetings. Plaintiff stated that she went out to eat twice a week. She had seen one movie over the past six or nine months. Plaintiff visited with her mom and grandmother once every two weeks. (Tr. 60-63)

Plaintiff testified that Dana Brantley, a nurse practitioner with Dr. Kilo's office, gave Plaintiff exercises for neck, joint, and heel pain. Plaintiff attempted to do the exercises for her heel, but she was unable to get through all the repetitions. Nurse Brantley also recommended that Plaintiff stay

4

off her foot and alternate between hot and cold packs. No physician recommended formal therapy or surgery for Plaintiff's heel. (Tr. 63-65)

Vocational Expert Arthur E. Smith also testified at the hearing. The ALJ posed a hypothetical with an individual of Plaintiff's age, education, training, and past relevant work experience. The individual was limited to lifting no more than 15 pounds and carrying no more than 10 to 12 pounds. The individual also had the limitation of standing no more than 30 minutes to one hour at a time; walking no more than 15 to 20 feet at a time; sitting no more than 30 minutes at a time; and no regular or frequent bending, stooping, squatting, or stair climbing. In response to the question of whether such individual could perform any of the Plaintiff's past relevant work, the VE answered, "[n]o." However, the VE testified that there were other jobs that the hypothetical individual could perform. These sedentary jobs which allowed the individual to change positions included cashiering positions; jobs as a telemarketer or telephone solicitor, and jobs as an information clerk, receptionist, and diet clerk. There existed approximately 20,000 such jobs in the St. Louis area, and 100 times that number in the national economy. However, if the ALJ credited Plaintiff's testimony regarding her complaints and limitations, the individual could not perform those or any other jobs. The VE mentioned that Plaintiff's inability to sustain concentration, inability to be on time, excruciating heel pain, and taking three to four times longer to complete normal activities would preclude the performance of all jobs. The VE further stated that the jobs he mentioned required an expected level of performance in order to continue employment. (Tr. 65-67)

Before adjourning, the ALJ indicated that he would order Plaintiff to undergo psychological testing. The tests would include a Beck depression test and an MMPI. (Tr. 68-70)

In a questionnaire, Plaintiff indicated that she was able to take care of her child and 2 pets,

5

pay bills, perform all household activities, use the computer, and drive. She did not have problems getting along with other people, nor did others have problems getting along with her. (Tr. 143-139)

**Medical Evidence**

Dr. Robert Rifkin treated Plaintiff for depression from June 2000 through December 2001. Treatment notes indicate that Dr. Rifkin prescribed Zoloft, which helped with Plaintiff's mood swings. He also prescribed Wellbutrin and Xanax. During her intial evaluation Dr. Rifkin assessed dependent traits, obesity, and a GAF of 60.[1] (Tr. 231-236)

On August 13, 2002, Alison Burner, M.A., evaluated Plaintiff. Psychologist Burner noted that Plaintiff was cooperative and oriented to person, place, and time. Plaintiff showed no evidence of perceptual disturbance or paranoia. Plaintiff's memory was intact, and she was able to perform calculations. Her abstract thinking was within normal limits, and her insight and judgment were in the average range. Plaintiff's attention and concentration were adequate. She reported that her mother was the cause of her depression and tardiness. Plaintiff also stated that she worried about getting to places on time and not being able to accomplish goals. (Tr. 219-221)

Plaintiff reported that she was able to adequately care for her daily needs. She could grocery shop and perform household activities such as laundry and cleaning. Plaintiff had no difficulty with social functioning, although her social activities were limited due to her financial situation. On a typical day, Plaintiff woke up at 11:00 a.m., took care of her son, and did household chores. Plaintiff reported doing all of the cooking. In the evenings, she did social activities with her son, who was

---

[1] A GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

involved in a variety of sports. Plaintiff went to bed at 1:00 a.m. (Tr. 221-222)

Psychologist Burner found that Plaintiff exhibited no symptoms warranting a psychiatric diagnosis which would negatively affect her ability to obtain or maintain employment. She noted that Plaintiff described everyday life stressors as the root of her depression and anxiety. While Plaintiff's symptoms did not meet the criteria for any DSM diagnosis, Psychologist Burner noted that Plaintiff's level of functioning could be the result of medication. Psychologist Burner diagnosed obesity, arthritis, and acid reflux. She assessed a GAF of 60-65. (Tr. 222)

In September 2002, social services referred Plaintiff to the St. Louis County Department of Health for depression. Plaintiff requested counseling to deal with her weight. The social worker noted that Plaintiff was a good candidate for counseling. (Tr. 214) Earlier progress notes indicated diagnoses of gastroesophageal reflux disease (GERD), Obesity, Anxiety, and Arthritis. Plaintiff took Prevacid, Buspar, and Celebrex. (Tr. 215)

Dr. Charles Kilo treated Plaintiff for a variety of complaints. On May 3, 2003, Dr. Kilo assessed GERD, Anxiety, and contact dermatitis. He prescribed Xanax, Nexium, and Naproxen. Plaintiff's weight was 358 pounds. (Tr. 209) On July 18, 2003, Plaintiff complained of a sore throat and cough. Dr. Kilo diagnosed sinusitis, GERD, and Anxiety/Depression. (Tr. 208) Plaintiff complained of more problems with anxiety and depression on August 30, 2003. Plaintiff had discontinued Zoloft due to sexual side effects and because she felt better. Dr. Kilo prescribed Lexapro for depression/anxiety. (Tr. 207) In November 2003, Plaintiff continued to complain of depression. She requested a stronger dose of Lexapro. Plaintiff also complained of left heel pain. Dr. Kilo assessed plantar fasciitis. (Tr. 206) A letter dated October 23, 2003 revealed that Dr. Kilo's office identified symptoms of anxiety and depression and treated them with medication. However,

7

the symptoms were not related to her ability to work, and the office did not provide formal counseling. The office was unable to complete the Medical Assessment of Ability to do Work-related Activities (Mental) due to lack of clinical information. The office suggested that Plaintiff seek an outside psychiatrist or psychologist to complete the evaluation. (Tr. 205)

Dr. Andrew T. Pickens performed a psychiatric examination on January 8, 2004. Plaintiff reported a diagnosis of anxiety and depression. She had never been psychiatrically hospitalized, and she was not under psychiatric care due to lack of health insurance. Plaintiff stated that she took Xanax and another antidepressant which helped with the mood swings but not totally. She reported being anxious around others, difficulty sleeping, and crying spells several times a week. Plaintiff also stated that she overate. Plaintiff spent her time doing things around the house such as dishes and laundry, reading, watching TV, talking to friends on the phone, and socializing with relatives. Dr. Pickens noted that Plaintiff was markedly obese. She complained of arthritis in her neck and left knee, a left heel spur, back pain, sinus headaches, and difficulty hearing. (Tr. 198-199)

Plaintiff's mental status examination revealed adequate hygiene, goal-directed speech, dysthymic mood, appropriate affect, and cooperative attitude. Her insight was below-average, and her intelligence was average. Dr. Pickens diagnosed dysthymic disorder, mild; general anxiety disorder, mild; passive dependent personality disorder, severe; and a GAF of 65. He noted that Plaintiff had no significant deficiencies of concentration, persistence, or pace. She was not socially withdrawn with regard to family, but she was somewhat withdrawn with strangers. Dr. Pickens opined that this was due to her passive dependency. He further noted that Plaintiff had not actively sought employment. He found no significant restrictions of her daily activities, noting that she performed normal housework activities. Plaintiff was competent to handle financial affairs and

8

perform basic tasks and make decisions required for daily living. Dr. Pickens opined that Plaintiff could benefit from formal psychiatric treatment and counseling to motivate her to be more productive. (Tr. 199-200)

Dr. Pickens also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). He found a moderate impairment in Plaintiff's ability to carry out detailed instructions and a slight impairment in her ability to make judgments on simple work-related decisions. Her impairments with regard to interacting appropriately with the public and responding appropriately to changes in a routine work setting were slight. She had moderate impairments in her ability to interact appropriately with supervisors and co-workers, as well as her ability to respond appropriately to work pressures. (Tr. 201-202)

On February 26, 2004, Paul W. Rexroat, Ph.D., evaluated Plaintiff at the request of disability determinations. Plaintiff's presenting problems included obesity, anxiety and depression, obsessive compulsive disorder, and binge eating. Plaintiff reported that Xanax and Lexapro improved her mood some and reduced her crying spells. During her mental status examination, Plaintiff exhibited a mildly restricted range of emotional responsiveness and a slightly flat affect. She had a normal energy level and was alert and cooperative. Her speech was normal, coherent, and relevant. Plaintiff reported occasional mood swings and panic attacks one to four times a month. Plaintiff was depressed the majority of the time, and she had crying spells once or twice a week. She stated that she either slept very little or a lot. She binged on starches and sweets and vomited about 5% of the time afterward. (Tr. 185-187)

Plaintiff's memory was good, and Dr. Rexroat estimated that her IQ was in the average range. The Beck Depression Inventory-II test placed Plaintiff in the serious depressed range. The Minnesota

9

Multiphasic Personality Inventory-II (MMPI-2) test revealed "much denial of common, ordinary faults and imperfections, average overall defensiveness, and an extremely high level of uncommon responses. This pattern suggests an extreme tendency to overstate problems." (Tr. 187-188) Dr. Rexroat clarified that Plaintiff's tendency to overemphasize problems suggested possible motivational distortion to portray emotional disturbance. Other possible factors included acute distress, high degree of self-criticism, or a desire for attention, sympathy, and assistance. (Tr. 188)

Dr. Rexroat also noted that Plaintiff was unstable, impulsive, and experienced much unhappiness and frustration. There existed the possible risk of suicide or other self-destructive behavior due to the combination of distress, depression, and impulsive tendencies. Plaintiff also appeared to be disorganized and confused. She worried excessively and overreacted to minor matters, possibly to the point of obsessiveness. Dr. Rexroat found that Plaintiff expressed unusual ideas, perceptions, and experiences which suggested a possible thought disorder. While Plaintiff expressed a high level of depressive and anxiety features, Dr. Rexroat noted that the conditions had to be evaluated in the context of Plaintiff's tendency to overstate problems. Plaintiff also expressed many health worries and concerns and displayed indications of social introversion. Her personality traits revealed irresponsibility, impulsiveness, and lack of concern for others. Her antisocial features suggested that she may approach counseling in a cool, distant, and manipulative manner. (Tr. 188-189)

Dr. Rexroat noted that Plaintiff functioned in the average intelligence range. She could understand and remember simple instructions and sustain concentration and persistence with simple tasks. She had moderate to marked limitations in her ability to socially interact and adapt to her environment. Plaintiff also had moderate to marked limitations in activities of daily living and social

functioning. Plaintiff was able to sustain concentration and persistence, and she exhibited adequate pace. Her memory was average, and she was able to manage her own funds. Dr. Rexroat's diagnoses included: major depression, recurrent, moderate; panic disorder without agoraphobia; binge-eating disorder NOS, with very little purging; and a GAF of 55. Plaintiff's motivation was good and her prognosis fair. (Tr. 190-191)

Dr. Rexroat also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). He found that Plaintiff's impairment did not affect her ability to understand, remember, and carry out instructions. She had moderate restrictions in her ability to interact appropriately with supervisors and co-workers and respond appropriately to changes in a routine work setting. Plaintiff had marked restrictions in her ability to interact appropriately with the public and to respond appropriately to work pressures. Dr. Rexroat noted that Plaintiff's depression and panic disorder produced these limitations. (Tr. 193-194)

### The ALJ's Determination

In a decision dated June 23, 2004, the ALJ determined that Plaintiff met the disability insured status requirements on the alleged onset date and continued to meet them through at least 2006. She had not engaged in substantial gainful activity since the alleged onset date. The ALJ further found that Plaintiff had a dysthymic disorder, mild; a general anxiety disorder, mild; a passive dependent personality disorder, severe; gastroesophageal reflux disease; obesity; arthritis; and plantar fasciitis. However, she did not have an impairment or combination thereof listed in or medically equal to an impairment in the appropriate Listings. In addition, the ALJ found that Plaintiff's allegations of symptoms of such severity precluding all types of work activity were inconsistent with the evidence and not persuasive. He noted that he carefully considered all the medical opinions regarding the

11

severity of Plaintiff's impairments. He found that Plaintiff was credible to the extent that her RFC limited her to lifting no more than 15 pounds; carrying no more than 10 to 12 pounds; walking no more than 15 to 20 feet; standing no more than 30 to 60 minutes at one time; sitting no more than 30 minutes at one time; having a sit/stand option; and requiring no regular or frequent bending, stooping, squatting, or ascending/descending of stairs. Plaintiff was unable to perform her past relevant work. However, she was a younger individual with a high school education. Based on the VE's testimony, Plaintiff could perform the approximately 20,000 cashiering, telemarketer, telephone solicitor, information clerk, receptionist, and diet clerk jobs in the St. Louis area. Therefore, the ALJ concluded that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 24-25)

## **Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her

impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he

or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## Discussion

Plaintiff argues that the ALJ improperly considered Plaintiff's residual functional capacity (RFC) within the standards of Eighth Circuit case law and the social security regulations. Plaintiff also asserts that the ALJ performed an improper credibility analysis. Finally, Plaintiff contends that the hypothetical question to the VE was improper. The Defendant, on the other hand, maintains that the ALJ properly considered Plaintiff's RFC, evaluated the credibility of Plaintiff's subjective complaints, and posed a hypothetical question to the VE. Thus, the Defendant asserts that substantial evidence supports the ALJ's determination.

The undersigned agrees that the substantial evidence supports the ALJ's determination in this case. He properly discredited the Plaintiff by noting inconsistencies in the record under the Polaski

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

14

standards. The ALJ first assessed the medical evidence, which included the reports of Plaintiff's treating physician and psychologist, and the consulting psychologists and psychiatrist on behalf of disability determinations. He noted the sparse medical evidence with regard to Plaintiff's alleged physical impairments. (Tr. 19-20) Failure to seek regular medical treatment is inconsistent with complaints of a disabling impairment. Comstock v. Chater, 91 F.3d 1143, 1146 (8th Cir. 1996). The ALJ pointed out that Plaintiff was not prescribed an assistive device for ambulation and that Plaintiff had not sought treatment on a regular basis through physical therapy, a work hardening program, or a pain clinic. Further, no physician recommended surgery or suggested that Plaintiff cease working. (Tr. 19-20) Allegations of disability may be discounted where Plaintiff relies on a conservative course of treatment and has never undergone surgery. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (citation omitted); see also Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) (ALJ properly noted that medical professionals had not indicated that plaintiff was precluded from performing work). Further, Plaintiff was non-compliant with prescribed treatment. Dr. Kilo encouraged Plaintiff to lose weight. However, she testified that she weighed 100 pounds more than when she worked, and the medical records indicated a propensity to binge eat. An ALJ may use evidence of a plaintiff's non-compliance to weigh the credibility of subjective complaints of pain. Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).

In addition, the ALJ discussed the psychological records which indicated moderate impairments of social functioning with an ability to understand and carry out short, simple instructions and manage her own funds. She had never been hospitalized in a psychiatric facility. He further noted that, although Dr. Rexroat assessed marked limitations in social functioning and activities of daily living, this assessment conflicted with his treatment notes, a GAF score of 55, and his observation that

15

Plaintiff had a tendency to overemphasize her symptoms. (Tr. 20-21) Exaggeration of symptoms is a proper basis for finding plaintiff's testimony not fully credible. Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997). The record shows that Dr. Rexroat opined that Plaintiff did not have a substantial loss of ability to understand and remember short, simple instructions; carry out short, simple instructions; understand and remember detailed instructions; carry out detailed instructions; or make judgments on simple work-related decisions. (Tr. 193) She only exhibited moderate limitations in interacting appropriately with supervisors and co-workers and in responding to changes in a routine work setting. (Tr. 194) It is worth noting that Dr. Rexroat saw Plaintiff on only one occasion. The opinion of a physician who examines a plaintiff on only one occasion does not generally constitute substantial evidence. Anderson v. Barnhart, 344 F.3d 809, 812 (8th Cir. 2003); Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000).

In addition, the record demonstrates that Plaintiff's other psychologists/psychiatrists indicated that Plaintiff responded well to medication. Plaintiff reported on several occasions that medication decreased her mood swings and crying spells. "An impairment which can be controlled by treatment or medication is not considered disabling." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); see also Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (citations omitted) (same). The ALJ therefore properly refused to give Dr. Rexroat's opinion controlling weight. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir. 2004) (substantial evidence supported ALJ's refusal to give doctor's opinion controlling weight where the objective medical evidence did not support the opinion that plaintiff was unable to work).

While the ALJ may not discount Plaintiff's allegations based solely on the objective medical evidence, the ALJ may disbelieve subjective complaints if the evidence as a whole contains

inconsistencies and the ALJ expressly discredits Plaintiff's complaints of disability. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005). Here, the ALJ also assessed Plaintiff's testimony, including her daily activities. The ALJ noted that Plaintiff was able to perform the household activities, including cooking, cleaning, laundry, and shopping. Plaintiff also watched TV, read, drove, and socialized with family. These activities are inconsistent with her allegations of disabling pain. Gwanthey v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (holding that Plaintiff's ability to perform housework among other activities precluded a finding of disability). Therefore, the undersigned finds that substantial evidence supports the ALJ's credibility determination.

With regard to Plaintiff's contention that the ALJ improperly determined that Plaintiff had the RFC to perform work that was available in significant numbers in the St. Louis area and in the national economy, the undersigned finds that substantial evidence supports the ALJ's RFC determination. In assessing Plaintiff's RFC, the ALJ considered Plaintiff's testimony of her symptoms and limitations, the medical evidence from treating physicians, and the opinions of the consulting physicians. Brown v. Barnhart, 390 F.3d 535, 539 (8th Cir. 2004). The burden of proof rests with the Plaintiff to establish her RFC. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). This is true even where the burden of production shifts to the Commissioner at step 5. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (citations omitted). Plaintiff asserts that the ALJ failed to properly consider the limitations expressed by Drs. Rexroat and Pickens. However, as previously stated, both doctors assessed a GAF score of 55 and 65, respectively, which indicated only mild to moderate symptoms. Additionally, Plaintiff's mental impairments were controllable by medication. These are proper bases for determining that Plaintiff's depression and anxiety were not as limiting as she alleged. Goff, 421 F.3d at 793.

17

Further, Plaintiff's own testimony supported the ALJ's RFC finding. Plaintiff testified that she could lift 15 pounds and carry between 10 and 12 pounds; sit for up to 30 minutes; walk 15 to 20 feet; and stand between 30 minutes and an hour. (Tr. 53, 60, 66) The ALJ's RFC finding reflected Plaintiff's descriptions of her own functional capacity. Therefore, substantial evidence supports the ALJ's determination that Plaintiff possessed the RFC to perform work.

Likewise, the ALJ properly relied on vocational testimony to find that plaintiff could work as a cashier, telemarketer, telephone solicitor, information clerk, receptionist, and diet clerk, which jobs existed in significant number in both the state and national economies. "'A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.'" Goff, 421 F.3d at 794 (quoting Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); see also McKinney v. Apfel, 228 F.3d 860, 865 (8th Cir. 2000) (hypothetical question only needs to include impairments that are supported by the record and that the ALJ accepts as valid). Here, the ALJ did not include those alleged impairments and subjective complaints that he properly discredited. As previously stated, the record did not support Plaintiff's assertion that her impairments were disabling. Based on a proper hypothetical, the VE testified that plaintiff was able to work certain sedentary jobs which existed in significant numbers in the state and national economy. Therefore, substantial evidence supports the ALJ's determination that plaintiff was not disabled. Id.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

/s/ Terry I. Adelman<br>UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of March, 2006.